Next case is Honeywell International v. Mexichem Amanco and Dakin Industries, 2016-1696. Mr. LoCascio. Thank you, Your Honor. May it please the Court. For over a decade, the world searched in vain for a safe, stable heat transfer composition that would not contribute to global warming. In 2002, Honeywell discovered the unexpected solution, that a combination of what was a disfavored, unsaturated refrigerant, HFO-1234-YF, and a reactive lubricant, polyalkylene glycolopag, solved that problem. Counsel, I think we're aware of what we're dealing with here. Why don't you speak to whether the Board relied on a new reference, and how did it use that reference? Sure. Thank you, Judge Rainer. This is the first of the two bases for this one, for vacature and remand. We'll get to obviousness on reversal in a second. But the Board definitely relied on a new ground, and that ground was reliance on a MURA. And to start out with, where the Board relies on a new ground, obviously the applicant's entitled to respond to that. In this case, the MURA reference, there's no testimony from anyone, or any indication of what one of skill and the other would read that to be, because the examiner didn't rely on it. It's not mentioned in the RAN, it's not mentioned in the ACP at all. And then the Board comes around to that and actually starts to become fact-finder, as if this was an IPR and not a re-exam appeal, and relies on a MURA. And how they do so is at base, comparison, the standard test, obviously, Biedermann, Lytham, compare the examiner's decision to the Board's decision. And the examiner specifically said, in the RAN, let me take one step back, the patent owner here provided expert testimony, declarations, Dr. Chambers, Dr. Thomas, speaking to the unpredictability that one believed would be the case when you use an unstable lubricant and unstable refrigerant, and actual test data to show unexpected results on that score. The examiner rejected that. And the examiner rejected that, this is at A2580 in the RAN, by saying that the stability data presented do not contradict the fact that stability is an inherent property. The Board, when they look at that exact question, specifically says, page A29, we disagree. And then the Board goes on to say that the evidence that the examiner disregarded from Dr. Chambers, Dr. Thomas, was actually evidence the invention is not obvious and must be considered. That's in the Board's decision. What the Board then goes on to do is say all the actual evidence, yet to get to a MUIR, shows unpredictability of the miscibility and stability of this particular combination. And if you take all the Inagaki embodiments and you try them with a pag, embodiment 1 doesn't work. Embodiment 4 doesn't work. This particular 1234YF works, and it's unexpected. Then what the Board does at A30, A31, and A33 is say, but a MUIR says the opposite. And so what the Board says at A31 is we have Chambers. However, a MUIR statement that another HFO compound also having a double bond and highly reactive fluorine atoms shows superior thermal stability is a fact that we weigh against Chambers' assertion that the results of 1234YF and a pag were necessarily unexpected. Thus, as evidenced by a MUIR, a skilled artisan would no more have expected failure with respect to the stability of combining hydrofluoroolefins with pag. So did the Board use a MUIR just to rebut the secondary considerations evidence? I would say no, but I think the argument now to try to save this, if you will, both I think the Board, I don't think that they included it only after the heading secondary considerations at pages 30 and 31 makes a difference, and I think to try to salvage it, that's the argument we see back from the appellees. It isn't because what a MUIR is being used for is a MUIR is the glue. Obviously, for the obviousness rejection to start with, there has to be a reasonable expectation of success. Why would you pick these two things that no one picked for a decade to combine, and would you expect them to work? Well, a decade and not. I mean, you've got, what is it, Inugaki, which has these five compounds, one of which is a tetrafluoropropene, and a suggestion of a lubricant, and among the lubricants are polyalkylene glycols. I want to disagree with your perception of Inugaki on that for a second, and I do want to come back just one bit on Judge Randall's question. Inugaki discloses a class of 30 compounds. Inugaki discusses four embodiments it calls typical, one through four. Then at the end, Inugaki purports to provide data for examples one through four. Example five, which is 1234YF, has no data, and it says it's almost similar results. There's nothing in Inugaki that says which of the 30 to pick or which of the five to pick and why you'd use them, and to your question about lubricants, Judge Lurie, the only reference at all, there has been, I think, by the board and now by the abilities, an over-reading of Inugaki. There are statements in these briefs that say Inugaki specifically says use embodiment five. It does not. Statements that say Inugaki specifically says you can use it with a lubricant. What Inugaki says, the only reference at all to a lubricant is in cases where there are— Inugaki does specifically disclose HFO1234 as one of five examined compounds. Then it goes on and says all you have to do now or next is add machine oil. Wouldn't somebody skilled in the art look at that and take that machine oil and see what other types of oil there are? What I'd say to that, Judge Rain, is Inugaki doesn't say take those and put a lubricant with them. What Inugaki actually says— No, but that's what somebody skilled in the art would understand. Well, what Inugaki—the question here and the invention in part is this particular combination, the miscibility, meaning how do two things, sort of an oil and water exercise, do they stay together or do they not stay together, of a refrigerant and a lubricant is unpredictable. The board recognizes that. It's undisputed that that is an unpredictable event. What Inugaki says about lubricants is if you want to improve the solubility, you can mix this class of HFOs with prior refrigerants like 134A, 143A, and those— Or PAG under the McGid reference? I think—pardon me. I think either I think I've misspoke or we have some confusion here, which is what Inugaki says is you can mix it with other refrigerants is what I was saying. I was thinking about the lubricant. No, and the only discussion of lubrication at all in Inugaki is you can combine— if you combine this class of refrigerants with some of the earlier refrigerants, which have high global warming, which you don't want, putting aside that Inugaki is silent on global warming potential, that would improve solubility, which obviously begs the question, well, what's the solubility like of this actual class of HFOs with any particular lubricant? But to take your— Discussing embodiment one of Inugaki, you say 1, 2, 3, 4, ZF has unacceptable toxicity and flammability. True. And in the red brief, the response is yeah, but that's not YF, and you don't have any specific evidence to support that. So I saw that, and I think it's an interesting effort to kind of flip this around, which is the argument, all the evidence of people of skill in the art, and the vast secondary considerations evidence in this case, is that this is a groundbreaking step change, and the reason Honeywell succeeded is because they looked not just where no one had looked, but where people were decidedly told not to look. And so they don't dispute, in the Daikin red brief, they don't even disagree with the idea that as a class of compounds, people thought unsaturated, meaning double-bonded refrigerants, were not where you wanted to be if you wanted low global warming, safe for the environment, and particularly working with an unstable or reactive lubricant, like a pack. The rebuttal to that is, okay, even if everybody thought that about the whole class, and even if you have experts saying we knew this one was, and we knew this one was, no one at the time had examined 1234YF specifically. I don't think that changes anything. If everyone says don't use this class of compounds, and we've tested a whole host of them. Well, that wasn't, I mean, they didn't say that exactly. They said you didn't present any evidence. What we did present, it's not surprising that we didn't present evidence that this particular combination that Honeywell discovered was toxic, flammable, or unstable, because the reality was what's the unexpected results here is that this particular combination went against what everyone thought about the class. So it's a bit of a catch-22. They're like, well, you didn't say it doesn't work. Well, obviously we know it works now, but for a decade no one looked there. I think it's important to think we're talking about what do people of skill in the art think in 1992 to 2002. Inagaki is a patent application filed by Daikin. It's Daikin's own work, and what do they do with it? If it's so obvious to those of skill in the art, they abandon it, and their only answer to that is, well, we didn't think there was enough commercial utility in doing so. They've already chosen to file a patent application. If it was so obvious that the fifth one described, but not the others, worked so well, why abandon it? I mean, that's certainly evidence that goes to skepticism and what those of skill in the art knew at the time. Not necessarily. What they say is at the time there was no call for this. Which isn't true, because at the time they argued that people only cared about ODP, ozone depletion. The prior refrigerant, 134A, good for ozone depletion, really bad. It's 1,600 times worse from global warming than ultimately what 1234YF proved. They say no one cared about global warming. A615, the only testimony on this. CFCs, the even class before that, was known to lead to GWP, high GWP in the 70s. And the UN framework on climate change is 1992. That starts talking about global warming potential. The Kyoto Protocol is 1997. Also during this window, and no one's looking back at Inagaki, because Inagaki didn't know and didn't say anything about global warming potential. And then A1786. But the regulatory climate back at that period was different. I don't think, let's all step back to our own... Do you believe in regulatory climate change? Well, if we step back for a second and think, why do these companies, the biggest companies in the world, Daikin, Honeywell, Arkema, Mexichem, all the chemistry companies in the world are looking at all these refrigerants. And they all know global warming is an issue. They don't decide, well, let's invent a better one that's 1,600 times, only when the government tells them to. Because as was demonstrated here, after Honeywell demonstrated that this was now low global warming, safe, could work with a pag when everyone thought it couldn't, what happens? Commercial success, that's tied specifically to this, although the board disregards it entirely. You wanted to save some rebuttal time? I do. I want to finish this point, but I appreciate the courtesy of that. And then we hear from people in the industry, what was considered impossible has become possible. And this isn't the run of the mill, we have some secondary considerations case. They were disregarded here, and we have all the players failing to find it, amazed and surprised. Dr. Bivens, who was at DuPont, says, in 30 years, this was the invention in fluorine chemistry of my lifetime. And all of that's disregarded by the board as well. And so we think the board failed on obviousness. They found a motivation where there was one, and if at best, they backfilled it with a mure. And there's no argument this is not a new ground of rejection, and a minimum should be vacated and remanded, to be honest. Thank you. We will save the remainder of your time. Thank you. We move from Mr. Locascio to Mr. LoCicero, which Judge Wallach says is sort of Shakespearean. It does, Your Honor, and thank you for not confusing it. And you're going to take 10 minutes and yield five to Mr. Krumholz. That's right, Your Honor. Let me start by providing an answer to the two questions that Judge Rayner asked. The first was, did the board use Omori only to rebut our evidence? And the answer is yes. In fact, the board in footnote 14, which appears at appendixes 11 and 12, says that they used Omori just as evidence of the state of the art, and that Honeywell was on notice prior to the briefing at the board as to Omori's teachings as evidence of the state of the art. Omori was not used to reject. It simply was not. What happened is that we had the evidential— But isn't the problem here that Omori was not before the examiner? Well, it was—may I disagree, Your Honor? It was before the examiner. It was—it had been referenced by both Mexichem and Dyck and the two rejecters years earlier. It was simply not referred to in the examiner's right of appeal notice or rejections. So it's not that it was— Well, if the board then comes along and refers to it in making this decision, isn't that basing a rejection on new grounds? I don't think so, Your Honor. I think that the rejection is in Agaki, which has been talked about, in view of Bivens and Acura and Majid and so on. I think that what happened— But those references were before the examiner. They were before the examiner. They were cited, and they provide—the answer to Your Honor's second question was whether a worker skilled in the art would seek to use a proper lubricant, and the answer is, of course, yes. And, you know, the secondary reference that we've come to think highly of is the one that Mr. Locasio referred to, which is Bivens. Counsel, I note that the board said we agree with the patent owner that similar stability of HO41234YF in PAG would not have been expected. In other words, you've got an unexpected property here. And then they come to the conclusion by disparaging properties as being inherent. Pages 44 and page 15 of their opinion, the properties are inherent. One cannot obtain patentability based on inherent properties. But we're talking obviousness here. Inherent properties don't make novel something that is known. But here we're talking about obviousness. And that which is only inherent and not known does not lead—does not defeat obviousness because you don't know of it if it's only inherent. Yes, Your Honor, that's certainly an accurate statement of the law. But what happened here is this. Honeywell, after the examiner made a prima facie case of obviousness, and then because it's an examinational procedure, not an adjudicative because it was inter partes re-exam, then the burden properly shifted to Honeywell, not the burden of proof, but the burden of production. And so Honeywell put forth evidence of so-called unexpected stability. Let's take that one. And in response to that, to counter that, the rejectors—the requesters, rather, Mexichem and Diken, put forth Omori and said that stability would have been— Before the examiner? Yes. Well, before the board. Before the board. Before the board. And the board disagreed. The board said no. And the board concluded that the fact that a different HFO, the one disclosed in Omori, was shown to be used with a PAG lubricant— What I'm getting at is the board seems to have overlooked what was clearly unexpected, whether it's the stability or flammability with a false legal premise, namely that you can't premise patentability on what is only inherent. And we're talking about obviousness. I think if that was error, then it was harmless error. Harmless error. Because you have—I believe it's appropriate to look at it in the context of the motivation to combine. What had happened here—and Honeywell in its brief makes a big deal about thousands of compounds and thousands of combinations, and therefore the whole thing, the whole ability to combine a refrigerant and a lubricant was unexpected. But that's not what happened. We're not talking about thousands of compounds. We're talking about an agaric. We're talking about an HFO. Which HFO? This one. The one that's recited in the claims. And we're talking about using lubricants. Which ones? Not any lubricants, but PAG lubricants. As the Bivens reference says, PAG lubricants are an acceptable alternative for use with HFC-based refrigerants, which is what we're talking about. So in that context, it was not unexpected. Now, I think that's right. I think an inherent property is relevant to the obviousness analysis. It's not relevant, I think, to the analysis of anticipation. But it is relevant because it determines where one would have looked. What would have happened in this case if Aru didn't come before the board at all? Let's say that had not been brought to the board. I think that the board would have said that it was unpredictable. Remember, I don't think it would have said that stability, for example— Would we be affirming the board? I think so. I think so. I think it would just further support— Well, the fact that it did appear before the board, and it was the basis for its decision, and it wasn't before the examiner, then shouldn't we reverse the decision of the board? I don't believe that would be correct. If Omori was a ground of rejection and was a new ground of rejection, then the case should be reversed and remanded. That's what this court's precedent says, and that's only fair. But the cornerstone of a new ground of rejection is whether or not Honeywell had notice, which they did, and an opportunity to respond. Remember, Omori and his teachings were not unknown. It was not a surprise to Honeywell when this came up during the board proceedings, but they simply never chose to discuss it. I think what happened— The issue isn't whether it was at the board, and the issue isn't who had opportunity to address this at the board. The issue is whether it was before the examiner. It was before the examiner, just not relied on by the examiner. There's no doubt that, as we said in the red brief, there's no doubt that Mexican and Dykin had mentioned Omori. I think what we have to look at—we have to ignore Omori, as your Honor suggests. If we ignore Omori, then what we would have had is the board making a factual finding, which is entitled to deference if it is supported by substantial evidence that stability is not unexpected. And as the board said, if you look at Table 3, which shows YF, the prior YF, by the way, and ZF and other of these HFOs, some of the characteristics, fluorine and TAN suggest that—and dimerization suggests that— some of those suggest that YF is better. Some suggest that ZF is better. Some suggest that YE is better. So the board simply said that this evidence does not overcome the very strong motivation to combine the prior Y teaching this refrigerant— not a different one, a similar one, one in the same class, but this refrigerant with this lubricant as shown by Bivens, Magid, and Ackerman. Bivens says that you use PEG lubricants with hydrofluorocarbon compounds, and that's what we have here. Well, the board also relies on Honeywell's expert, even without Omori. That's right. That's exactly right, Judge. And Honeywell's expert—we can get into the weeds here, whether dimers are generated. Even the board says that Honeywell's expert doesn't put forth evidence that the lack of or the failure to generate dimers is, in fact, evidence of expected stability. So it's a factual determination, which we believe would have stood even without Omori. One other thing I'd like to say in the remaining minute or so is my worthy adversary talked about Dykin's failure to pursue prosecution of Inagaki. Well, and he says it couldn't be that important if Dykin didn't go forward. On the other hand, as I think Judge Wallach has suggested, there's a declaration of Dr. Shibanuma, and Dr. Shibanuma explains what happened. He explains that they didn't pursue Inagaki, Dykin didn't, because at the time R-134A was the lubricant of choice, and it would have been so throughout most of the life of Inagaki, and they made the decision not to do it. And, of course, that testimony is unchallenged. Now what happened is that the global warming regulations didn't begin to be considered until the early 2000s, which is nine years after Inagaki was filed. So, in fact, Inagaki, if they had pursued it, it would have expired in 2010. So Dr. Shibanuma's testimony is unrebutted. It demonstrates that these so-called objective considerations are insignificant, and that Du Bois' decision should be affirmed on the basis of substantial evidence. Thank you. Thank you, Counsel. Mr. Krumholz has five minutes. Thank you, Your Honor. First time I ever walked up to this table, I tripped over my suitcase, so I'm trying to be careful. So far, so good. So far, so good. You fell into good company. Thank you, sir. I fully support everything my friend over here just said to you gentlemen. Including when he said that when he agreed that the board made error, he called it harmless error. Well, I didn't finish my sentence, sir, but I appreciate the interjection, because I did want to say, right up until, but I don't believe the board made any error. Because what we have here is the board considered the two main references, which are Inagaki and which are Bivens. But how can unexpected properties be ignored in an obviousness consideration when they're inherent? I think you first start when you look at the arguments that were made by Honeywell. Honeywell repeatedly argues that it was unexpected that this would have lower global warming potential. That only invokes the refrigerant 1, 2, 3, 4, YF, which is expressly disclosed in Inagaki. Honeywell repeatedly argues time and time again that it's the refrigerant properties that are what are unexpected. And that solely invokes 1, 2, 3, 4, YF. And those are inherent properties of that refrigerant. But aren't stability and the flammability properties unexpected and useful? I would agree that they're useful. But you have a specific reference that says, in Bivens, when you have an HFC refrigerant, you do not elect, as you used to under CFC refrigerants and go with mineral oils. You elect, and these are Bivens words, you elect the use of a PAG or a POE lubricant, a category of those lubricants. And we have here, we have an HFC. It's made of hydrogen, fluorine, and carbon. It's expressly disclosed in Embodiment 5 of the Inagaki reference. It's expressly disclosed as being compatible with lubricants. It's expressly disclosed as being mixable with 134A, which the record below clearly shows is used with PAG lubricants. And, in fact, that Acura reference shows it expressly being used with PAG lubricants, the most common type of PAG lubricant in an automobile, ND8. Counselor, the board said that it disagreed with the examiner with respect, with the examiner's reasoning on stability. Mm-hmm. Is that air? That the board disagreed with the examiner's reasoning on stability? I mean, it did say that. Yeah, yeah, but I mean, I don't think that's there. So where does that take you? It takes me to the point that I think the board gave what was far harder on the examiner's arguments than were correct, but I don't think the board made it. Didn't they rely on O'Murray in making that statement? O'Murray was brought into this case solely to rebut the position that Honeywell took after the fact where they made the broad statement that HFOs would never have been thought to ever be used with a PAG. That was the broad statement that was made. We brought that in to say that is not true, that it's expressly not true. And this is before the board. And that is expressed, that was before the board. I made that argument, excuse me, I raised that in an oral argument in response. Okay, these arguments were not made before the examiner. We brought up O'Murray before the examiner. Is that a yes or no? O'Murray, they were arguments that were made before the examiner because O'Murray was specifically identified in... The examiner did not rely on O'Murray in making this decision. Because he had the great prior art of Inagaki and he had the great prior art of Bivens, he did not need to bring in O'Murray. Remember, we have really strong prior art here. And we have embodiment five of Inagaki, which is the exact same chemical, one, two, three, four, YFs. So the examiner didn't have to rely on it, but the board did rely on it. The examiner didn't have to rely on it. The board chose to bring it up because I may have oversold it when I made my oral argument. Isn't that new grounds of rejection? No, it is not new grounds of rejection. It is simply identifying the secondary considerations that the state-of-the-art clearly showed that people prior to the date of invention would have mixed an HFO with a PAG lubricant. I'm sorry if I'm speaking too loudly. Sometimes my voice starts to rise and I don't mean to give offense if I do. I do want to raise one other issue really quick. I want to put on the record my objection on the basis of judicial estoppel that claims 1 through 25 should be stricken and they should not be preceded with based upon the absolute representations made by Honeywell to receive a stay of their case against Arkema in Philadelphia. They said they would never, ever go forward with those original claims. They went back on their word with the federal judge. I don't think they should be allowed to proceed. I have 14 seconds left if you have another question. You're down to 10, and it sounds like you're waving. Thank you very much. We ask that the decision be affirmed. Thank you. Mr. Locascio has a couple of minutes plus. Thank you. There's no avoiding that this is a new ground of rejection to Judge Rayna's point, and let's just talk about what the case law says. They say it's only about secondary considerations, and, well, it was the thrust of it or you were on notice. There's no case anyone points to that would say that's okay and it doesn't support a remand, and the reasons are obvious because under Biederman, Rambis, Stepin, all of them, in those cases, there wasn't even a new reference. Those references were all discussed by the examiner, and that wasn't enough. Those were new grounds for rejection. In this case, the examiner never said boo about it, and if he had, the process, the way it's supposed to work is then Honeywell would put in descriptions and evidence about what Amiri is. Amiri is not a C3. It's a C4 compound. Amiri sterically hindered all things that no one in skill in the art has ever put in the record, and instead, we have the board saying, well, we think this sentence that says relative stability flips all the expert testimony on its head. So it is a new ground, and it should be at minimum reversed and remanded. With respect to Inigaki, the statement footnote 14 says it was we had notice. We respond to the rejections of the examiner. That's how it works for the examiner, and when you get to the board, you are appealing a decision from an examiner. Notice might be relevant in an IPR. It is not the standard in any sense, and there's no case that says it is for reexamination. Judge, Laurie, your question I think hits this whole problem on the head of what the examiner did and what the board did. Inherency is all fine and well for anticipation. We have a combination, and by the board's own acknowledgment, this is not found in the prior art, and you have to pick two references. You have to pick two references, and we think starting with these two and saying, well, would you figure out that they're compatible is not the right exercise. But here, both the examiner twice, once rejected by the board, and then the board to overcome it at the end of the day says we think stability or miscibility is inherent. That's wrong as a matter of law because all the testimony is it was not known, and what was not known cannot be inherent. So we think there should be a reversal, not just a remand. Well, it may be inherent, but it doesn't contribute to obviousness. It does not support the obviousness rejection to be sure, and what people of skill in the art knew at the time matters. And the last point I'll make with your indulgence is the board turns obviousness on its head. It says the evidence from the patent owner shows it's unpredictable, but then via Murie, they say everything's unpredictable. And if everything's unpredictable, the board's view is nothing's patentable, and that's not this court's law. Thank you. Thank you, counsel. We'll take a case on revising.